IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,     :

       Plaintiff,

           v.             :

ROMAN GARCIA,

       Defendant.        :

Case No. 3:19-cr-116

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SETTING FORTH REASONS FOR
OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(DOC. #14)

---

Defendant, Roman Garcia, was indicted on various drug trafficking charges.

This matter is currently before the Court on his Motion to Suppress Evidence, Doc.

#14. The Court held an evidentiary hearing on the motion on December 2, 2019.

On March 17, 2020, the Court overruled that motion. This Decision and Entry sets

forth the reasons for doing so. Doc. #25.

I.     **Factual Background**

A package was sent by Federal Express from Uruapan, Mexico to Yesenia

Hernandez-Alvarez, at 1501 Westonia Drive, Dayton, Ohio. A border patrol search

had revealed that the package contained over 750 grams of fentanyl. Thereafter,

Homeland Security Investigations ("HSI") arranged for a controlled delivery of the

package to that address. Prior to delivery, they observed Defendant Roman Garcia, a known drug dealer, in the driveway of that address, speaking with Ms. Hernandez-Alvarez, who was his grandmother.

After Garcia left, a task force officer posing as a Federal Express employee placed the package on the porch. After Ms. Hernandez-Alvarez took it inside the house, agents executed an anticipatory search warrant. She told agents that her grandson had sent the package to her house and that she had texted him to let him know of its arrival.

Thereafter, Ohio Bureau of Criminal Investigation Special Agent Rich Miller and HSI Task Force Officer Jason Leslie went to Garcia's suspected residence at 415 North Wright Street. Although Garcia was not there, his mother was; she contacted him by telephone. Agent Miller informed Garcia that he was investigating a package of fentanyl that had been delivered to Garcia's grandmother's house. Miller told Garcia that if he was not willing to come talk to him, his grandmother would be "basically left holding the bag."

Garcia immediately returned to the house to speak to Agent Miller. Miller explained that the primary investigator, HSI Task Force Officer Josh Walters, was on his way there. While they waited for Walters to arrive, Miller talked to Garcia. However, he did not read Garcia his *Miranda* warnings and Miller asked no questions about the package. Nor did Garcia make any statements concerning it.

When Officer Walters arrived, he placed Garcia in the back of an unmarked police car and gave him his *Miranda* warnings. Garcia told him who had sent the

2

package from Mexico and told him of his possible plans to deliver it to another Mexican individual in Indiana. Walters then transported Garcia to the Montgomery County Sheriff's Office and again read Garcia his *Miranda* rights. Garcia completed and signed a form indicating that he had been given the *Miranda* warnings and was waiving his rights. Garcia told Walters that he had sent at least one other package to his grandmother's house. Walters warned Garcia that his grandmother could be arrested for her involvement. Garcia admitted that he had another 500 grams of fentanyl hidden inside of his own residence. He signed a form granting the officers consent to search his residence for those drugs.

After being indicted on drug trafficking charges, Garcia filed a Motion to Suppress, Doc. #14. He argues that: (1) the anticipatory search warrant executed at his grandmother's house was not supported by probable cause and the warrant conditions were not satisfied prior to its execution; (2) because he did not knowingly, intelligently and voluntarily waive his Fifth Amendment right against self-incrimination, the custodial statements he made must be suppressed; and (3) because the search of his residence was not voluntary and/or consensual, all evidence obtained as a result of that search must be suppressed. Garcia later withdrew the objections related to the anticipatory search warrant. Accordingly, the Court need address only the second and third grounds asserted.

## II. Waiver of Fifth Amendment Rights

Individuals taken into custody must be read their *Miranda* rights prior to being questioned by law enforcement officers. *Stansbury v. Cal.*, 511 U.S. 318, 322 (1994). They may choose to waive their right against self-incrimination, but any waiver must be knowing, intelligent and voluntary. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Government bears the burden of proving that a waiver of *Miranda* rights is knowing, intelligent and voluntary. *United States v. Binford*, 818 F.3d 261, 273 (6th Cir. 2016).

Garcia argues that, because he did not knowingly, intelligently and voluntarily waive his Fifth Amendment right against self-incrimination, the statements he made while in custody must be suppressed. In support of his argument, he cites: (A) language barriers; (B) improper threats to prosecute his grandmother; and (C) improper promises of leniency.

### A. Language Barriers

Garcia, who speaks Spanish, argues that, during the questioning, Officer Walters did not ask him whether he understood English. Garcia further notes that he was provided with a Spanish interpreter at the suppression hearing.

Officer Walters, however, testified at the hearing that it was clear that Garcia understood English. They carried on a conversation in English and Garcia's answers were responsive to the questions asked. At no point did Garcia indicate that he did not understand English, ask for an interpreter, or ask to have questions rephrased in Spanish. Doc. #20, PageID##75-76, 92, 96-97, 99. Likewise,

4

Special Agent Miller testified that it appeared that Garcia had no trouble understanding the English language. *Id.* at PageID#107, 112.

On the basis of this testimony, the Court finds that there was no language barrier that rendered Garcia's waiver of rights constitutionally defective.

### B. Threats to Prosecute Grandmother

As previously noted, Special Agent Miller told Garcia that unless he came to the house to talk about the package of fentanyl, his grandmother, who had accepted delivery, would be left "holding the bag." Implicit in this statement is the possibility that she would be subject to arrest. "[T]hreats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993). However, if the officers actually have probable cause to arrest those family members, a threat to do so does not constitute coercion. *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) ("the question whether the threat to prosecute Tracy was coercive turns on the issue of whether the threat could have been lawfully executed.").

In this case, prior to making the alleged threat, the officers knew that Garcia's grandmother had wired drug money to Mexico on his behalf and knew that at least one other suspected drug package had been delivered to her house. Ex. 4. On the date of Garcia's arrest, his grandmother accepted the package of fentanyl on his behalf. She hid the package in a closet and immediately texted Garcia to let him know that it had arrived. The Government correctly notes that these facts establish probable cause to believe that Garcia's grandmother was

5

complicit in his drug trafficking activities. Given that they had probable cause to believe that she was engaged in criminal activity, Agent Miller's implied threats to arrest her do not amount to coercion sufficient to render Garcia's waiver of rights involuntary.

## C.    Promises of Leniency

Garcia also argues that, because he was led to believe that he would be treated more leniently if he cooperated with the Government, his waiver of rights should be deemed involuntary. The Government notes, however, that promises of leniency amount to coercion only "if they are broken or illusory." *Johnson*, 351 F.3d at 262. Garcia has identified no such promises made by the law enforcement officers. The Court also notes that Garcia makes no effort to rebut the Government's argument in his reply brief. Accordingly, the Court finds that the Government did not coerce Garcia's waiver of rights through improper promises of leniency.

For the reasons stated above, the Court finds that the Government has satisfied its burden of proving that Garcia's waiver of his Fifth Amendment right against self-incrimination was knowing, intelligent and voluntary.


## III.    Effective Consent to Search

Consent is an exception to the general rule that law enforcement officers must obtain a warrant prior to searching someone's residence. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In his Motion to Suppress, Garcia argues

that his signature on the consent-to-search form was forged, and that because his consent was not voluntary, all evidence obtained as a result of the search his residence on North Wright Street must be suppressed.

In its Memorandum in Opposition to the Motion to Suppress, Doc. #21, the Government properly notes that any suggestion that officers forged Garcia's signature on the consent-to-search form, Ex. 6, is laid to rest by the videotape of the interview, Ex. 4, showing the officers explaining the purpose of the form and Garcia signing and dating it. Tellingly, Garcia did not even attempt to rebut this argument in his reply brief, Doc. #22. Moreover, as explained above, there is no evidence to support a finding that Garcia did not understand what the officers told him, or that the officers engaged in coercive conduct to obtain his consent. The Court therefore finds that Garcia's consent to search his residence was knowingly and voluntarily given.

## IV. Conclusion

For the reasons stated above, the Court OVERRULES Defendant's Motion to Suppress, Doc. #14.


Date: March 18, 2020

WALTER H. RICE
UNITED STATES DISTRICT JUDGE